assuming most people on the docket are familiar with our system, so I won't belabor the points. The main thing is to help us untangle these matters. I'm honored to sit this morning. We've got the circuit covered. Judge Elrod to my right from Texas, Judge Grace to my left from Mississippi, and I'm holding down the Louisiana end, so hopefully between it 21-50283, United States v. Fernandez. Mr. Sergi? Good morning, Your Honors. May it please the Court, opposing counsel, I have the privilege today of representing Mr. Luis Fernandez, an individual who was charged with being a user of a dangerous drug in possession of a firearm. Cutting to the chase, Your Honors, this is a Miranda case. The question is, did the government's action violate the two-part test to suppress a statement given by my client under both Elstead and Seibert? As I think we all know, if a suspect's statement is in violation of Miranda, then the Court has to look at whether or not the government employed a deliberate two-step process to sidestep Miranda. And the question is, first, what were the statements? And then we need to look at the totality of the circumstances to determine whether or not these statements should be suppressed. And here, if you look at the original affidavit, which is in the record from Corporal Kapt, who had, I believe, two and a half years' experience on the Odessa Police Department and one year in criminal intelligence, his affidavit said he responded to a 911 call that said my client had called 911 and said he was, quote, being chased by numerous unknown persons chasing him around multiple roadways in Ector County. And he advised that he had an AR-15 in his possession, and he appeared at the Odessa Police Department. He was met by Officer Kapt, who then took possession of the weapon. Now, one of the red herrings in this case is the public safety issue. There had been a shooting at the Odessa Police Department many years ago. However— How many years ago did you say? I believe it was five or six. I'm not sure. I thought you said how many. That's why I was curious. Oh, I'm sorry. I think I said several. All right. Go ahead. Anyway, and Judge Counts does allude to that fact. The government in its original briefing alludes to that fact. However, any time somebody voluntarily hands off a gun and has called 911 and said, I'm coming, that's attenuated any danger that you had, because he doesn't have possession of a weapon. He has no possession of any other article that could be dangerous. I guess I'm having trouble with this framing, because as I understand the video, he told the officers, while they're just trying to figure out what the heck is going on in the situation, that the car was clean, and there was nothing in it, and that it had already been checked by the sheriff. He's very frenetic, and they're trying to get him to calm down, lighting a cigarette and all, this whole— He already has admitted within a minute and a half of this, maybe two minutes, that he has been taking cocaine, but then he says his car is clean, and then they need to do a check of his car. So I don't really understand. I didn't feel like he was—that we could characterize this as—or I don't see what the evidence is that we could characterize this as him going to turn in some gun or be responsible. He was very frenetic, and he did it right from the get-go, before even there was any kind of reason to give him Miranda rights. I believe that, yeah. He volunteered, almost, this information, because they said, are you taking drugs? And he said, yeah, I had some last night, but I may have had some more, because I'm really stressed. And so the officer then knows that there's a crime with taking drugs and having a weapon. Well, Your Honor, I believe the weapon was in his lap, and I believe it's pretty clear from his affidavit that, as Officer Capps said, Fernandez displaying paranoid tendencies. He was delusional. He really didn't know— He's having a huge meltdown, I mean, from—I mean, no disrespect intended. He's having either drugs or mental health issues or something. And he can't really clearly articulate. If you look at what he actually says—and I'm going back to the drug issue—if you look at what he says, it takes a while for him to actually isolate, yes, I did perhaps have cocaine last night. And that, Your Honor, goes to the totality of the circumstances. But I believe, you know, there was no violence. I mean, what he says in the 9-1-1 call— He's delusional or something, and he thinks he's being chased. And I don't see—I was trying to figure out if, indeed, there was some evidence that he was being chased, and that's part of the after story. There's nobody chasing him. There's nobody chasing him. This is all in his mind. What in the sequencing of things as we look at the controlling cases that help us to see that, you know, these officers are sort of deliberately sidestepping, you know, given him Miranda and so forth, it's a fairly brief encounter compared to a longer one in which we're looking at it. So, I mean, where does— Perhaps the best sequencing is actually in the government's brief to the court below where it goes through a minute-by-minute recitation of the facts. And one of the—and I think to the heart of my case is that if you look at Judge Count's opinion, he notes at page 5 of 8 that, quote, a male voice states at 1.52 p.m., quote, I will probably Mirandize him and do a confession. And that is the heart of the case, because what we see here is a deliberate attempt to cure a problem that they realized they had. And interestingly enough, in the government's briefing below, that is not discussed. And it is discussed by Judge Counts. And so what we have here is the best evidence. I mean, these officers know that they have body cams. They're not going to say, I didn't Mirandize him, I need to go back and re-Mirandize him. But what they say is, I will probably Mirandize him and do a confession. And that, Your Honor, clearly shows their state of mind, because why would you Mirandize him if you thought that previous Mirandizing or that any of these other things were going to happen? And so that is really the heart of the case. And Judge Counts, in his opinion, which I believe is mostly well-reasoned, just glosses over that fact. He mentions it early on. Do we need to get in the head of the officer, or, I mean, what, I hear what you're saying, but, I mean, you want us to get in the head of the, you know, of what he had in mind, or, you know, what objectively can we look at in a video, or otherwise that underscores, you know, what you're saying. Is the statement, you're saying that's indicative of sort of being calculating about? Yes, Your Honor. I mean, we can't, you know, if you think about it, why would you make that statement? Because it is difficult to understand, you know, when you look at the testimony of somebody who is delusional, they already think that he's under the influence of drugs or alcohol, voluntarily drives to a police station, and then the whole sequence of events occurs. And I guess, I guess all that you just said makes, for me, the more compelling argument, at least for me it is, that he didn't knowingly and voluntarily waive any rights. I mean, everybody's saying he was delusional, that he was intoxicated, that he was under the influence of drugs. If all that's true, you know, my larger concern is how it is that he could have knowingly and voluntarily given up a constitutional right in that state. I find that, all I'm saying is I find that argument more compelling than the one that says these officers calculated some two-step process. I mean, when he drives up to the police station, I'm trying to figure out what's going on, whether or not he's being chased, why he thinks he's being chased. If there's no evidence of that, then I'm beginning to think that either he's delusional or he's under the influence of drugs or all of that. So that, to me, could explain how it is they gathered all this information at step one. So to say that they calculated these two steps to get around, I understand that argument, but I'm interested in the one where maybe he didn't knowingly and voluntarily waive a constitutional right. Your Honor, I agree with you, and that goes back to the pre-Mirandi statements that Judge Counts admitted, because if you look at what Judge Counts did, he admitted the pre-Mirandi statements and then the post-Mirandi statements, and then from the minute of arrest until Miranda, he excluded. And I think the evidence is rich that my client wasn't in a state to waive Miranda to understand what he was doing. If you look at the videos, if you look at the plethora of evidence that is in this case, what you see is a delusional man who's driving through Ector County and thinks he's being chased. It makes no rational sense. So the argument that you're referring to goes to the pre-Mirandi statements. And I agree with you, Your Honor, that that's when the officers are in the process of collecting the information. They already know that they have someone who's delusional. If you read through the statements, you see that he is, the officers are already talking about federalizing this case. They have a very sharp focus on user of... So is it a position that you have to just ignore those statements if somebody's just voluntarily saying things, even if they're delusional or not? Well, I think, again, it goes to the totality of the circumstances, whether, as Judge Gray said, whether or not he could knowingly and voluntarily make those statements. But they don't need those statements, though, do they? They don't need any of the... And why wouldn't that also go to the post-Miranda? Because if he's not yet come down off of whatever he's on, he still is not voluntarily. Your Honor, I would agree with you that it attaches to both ends of the spectrum. But we have to deal with the record that we have and the inferences that we have to make. And that is why when you look at his behavior and whether he really understood what he was doing when he made these statements, I think you realize that he's incapable of knowingly waving Miranda at that point. But they don't really need his statements at all, do they? Because they have him acting so strangely, and then they can get the toxicology reports or whatever and go with that. Which, Your Honor, the toxicology reports, I don't believe, at least from my review of the evidence, wasn't there. So there is no blood test. Can you help us with... Okay. I think that there's something to this. Whenever Corporal Kapitz, I think that's how you say it, he says, I think you can charge him with having the firearm and taking drugs. He says that fairly early. And if one were to believe that that is the moment when they decided they were going to charge him, the court already threw out, what's there that wouldn't be there? Because I'm just trying to see. I think there's already enough from the pre-Miranda's, even before they said that, there's already enough to get them to the gentleman being on the drugs. So even if you see it at that stage, when he formed the intent and that he stated it, why isn't, does that change anything? Well, I mean, Your Honor, I think, again, looking at the totality of the circumstances, I think Judge Counts was incorrect in not suppressing the pre-Miranda statements because of the very issues that you're addressing. He could not have voluntarily waived that given his state. Now, the record does show there was a competency evaluation and he was found confident, but it certainly doesn't go into his mental health history. And frankly, the officer would not have known that. There is no evidence of his mental health history in the record that the officer had known. But his behavior, Senator Quinan, is the fact that he appears to be delusional. What's the best case that says that they can't use the pre-Miranda, pre-forming the intent to charge him with something statements, given his delusional state? What's the best case for that? Your Honor, I believe that, in my opinion, the best case is Judge Stewart's opinion in United States v. Courtney from 2006, which talks about the break in time because you have, look, this time-space continuum. And in Courtney, I believe there was an eight-day break between conversations, which were, the first two were found to be potentially violating Miranda by the district court. Judge Stewart, you reversed that in that case. But you talk about the time in here, Your Honor, whereas in Courtney you have an eight-day break and a one-year break. Here, this is all within minutes. This is all within the hour. And I think that's part of the totality of the circumstances that we have to look at. I believe I'm out of time, but I'm happy to answer any other questions. Thank you for responding to the questions, and you've reserved your rebuttal time. All right, Mr. Durbin. Good morning. Please support. Let me jump in first to, I think, the last question you were asking, Judge Elrod, concerning the first statements that he made when he first was being interviewed. He had not been handcuffed. And his first statements were, I have it about 142.15 on Government Exhibit 2, and he's asked, do you use any sorts of drugs and so forth? He did not object to those. He did not move to suppress those before the district court. Those, I don't believe, are an issue. Now, whether or not they're sufficient to prove that he is a drug user for violation of Section 922, the user in possession, I don't know. That question hasn't been presented yet. I think there's an argument there. If you find that the post-Miranda statements should be suppressed, and I think it goes back to the district court, and then we all have to make a decision, can we go forward and prove his guilt based on what he originally said? So in answer to that question, I don't think that's really an issue, and the court doesn't have to resolve that, because he didn't contest those. He didn't dispute the admissibility of his first statements. Do you have to be habitually a user? I don't know the answer to that. Or just a current user? I think it requires some evidence of some sort of serial use. It does? I think so. But that means two or three times. I mean, I don't think that means that he has to use it for a year. But that— Last night and this morning? I don't know the— It just seems like that's what happened. Well, he said—that's what his first statements were. His subsequent statements during his interviews, now, he's used it since he was 21. He tells— Right, but I'm just using the part that's out there in the free world. That part, as I say, we have not looked at the sufficiency of it. I don't know if that's all that we have left when we go forward. I don't know the answer to that. We haven't made that kind of decision yet. With respect to the circumstances of his being delusional, there was no finding he was delusional, and I've watched those videos, and I don't see him delusional. I see him very agitated. I see him very excited, very upset. He shows up—the first video starts after—shortly after Caput's, or whatever his name is, and whoever else. I think there's an officer, Thielen, who's also interviewing him. He's not incoherent. He's not disoriented as to time and place. He knows he's met with the sheriffs. He knows that he's been up late at night. He knows that there are cars that have come by. The question of whether or not he was actually being followed, I think that's not answered. There is some reference in some of the recording to, yeah, the sheriff stopped somebody, and there was somebody who had a gun, but they weren't arrested. What's strange about this, not so much in a legal sense, but he is very reluctant to talk about what it is that has him so scared. He shows up and says, the cartel is following me. Well, in Odessa, that gets people's attention because the cartels do operate through that corridor. And so, 30 people following him, that gets their attention, and he shows up and he's got an AR-15 type rifle on his lap. That shooting that's referred to was a shooting a year before. It wasn't five years before. It was somebody who was driving between Midland and Odessa with a firearm, shooting out the window. I think he killed six or seven people. So this is still fresh in their minds. Now, I don't know how much that plays into it because I think, Judge Stewart, you asked about what was the sequence. And this is how I understand the sequence. Basically, he shows up, they get him out of the truck, they take the gun away from him, and they start talking to him. And it's, calm down, have a cigarette, please have a seat. We want to find out what's going on. And he's saying, I'm followed by 30 people. And then, do you use any sorts of drugs at 142.15? That's what the first question is. And he says, yeah, I used some last night. I'm trying to stay awake, I'm afraid. And throughout the discussion, which goes until about 2.30 in the afternoon, ultimately, he makes reference to this. And Kappitz asks him at one point, how do you know people are there? There's cars stopping at 3 o'clock in the morning in front of my house. And he lives way out on the west side of Odessa in sort of an isolated area. There's no houses around. So when there's a car that stops near his house at 3 in the morning, that's what he's perceiving. Now, whether they're actually pursuing him, I don't know. But that, to me, shows he's not incoherent. He's not delusional. He's not without capacity to make decisions. And he does, indeed, make decisions. Because during the interviews, at various times, he does think he was delusional. I don't know if they thought he was delusional. And one of them goes like this to indicate, well, I think he's kind of crazy. Yeah, but they're not trained psychologists. I mean, yeah, the guy... Well, they don't need to be trained psychologists, but you need to understand whether or not somebody's capable of knowingly and voluntarily waiving a constitutional right. Right. And he says during the interviews, he says, in response to one question, I think Kappitz asks him, how much do you use or how much do you use? And he says, don't put weight on me. He understands what the consequences of that question are. Don't put weight on me. That affects punishment. And then he's asked by Chadwick, will you talk to officers? And he says, it depends on the question. I don't want to get myself in any more trouble, and he's referring to the cartel, than I'm already in. And while he's sitting in the interview room, he looks up at the camera. You can see him look at the camera at one point. And he says, I know that's going to be played in court. And his concern is not that it's going to be used to incriminate him. His concern is the cartel is going to find out what he's doing and what he's saying. And that's going to get him in bigger trouble with the cartel. And the sort of confusing thing about all of this is he is very circumspect about telling officers what his problem is with the cartel, because their thoughts and their questions are going to, are you involved in drugs? Where do you get your drugs? I think where they want to know is, are you getting your drugs from them? And he says, no, it has nothing to do with that. Finally, at about 2.30 in the afternoon, he says, my wife ran away with one of them. And I had a phone conversation with him, and I said things, because he talks about disrespecting somebody. And he talks about a conversation in which I infer that he said something about his wife and said, I'm going to tell the kids. And after that, these cars started showing up. And so I think that's what the background to all of this is. I don't think he's delusional. I don't think he's incoherent. And his interaction with officers shows he knows what's going on. They just don't believe him that he's being followed. They find it such a preposterous story. And he doesn't explain it until after Caput is through with the interview. What did the trial psychological evaluation say about his mental state? I don't know. I don't know if I saw it. They didn't say he was paranoid? I don't know. Irrational? I can't answer that, Judge. All right. If it's in the record, I don't know. How far has this been, remind me, has this been expedited or something? Is it a 10-month sentence? Well, it probably should be. He was sentenced to 10 months, and he served it. He's already served it? He served it. He was released, and then he violated his supervised release, and he got another 10 months from Judge Counts. And so his, I think his current release date is in December of this year. This coming December? This coming December. Yeah, he served the first 10, got out. I can't remember. I think he failed . . . Because he wouldn't be under the other supervised release but for the original offense . . . Plus, I mean, it would raise questions about whether or not the conviction would stand if you suppress that evidence. And you were about to say you think he failed. I'm guessing you're going to say a drug test. I can't remember if he failed the drug test or failed to show up for it, but it had to do with a drug usage problem. To me, that's the issue of delusional. Do you want to address the case cited by opposing counsel, the 2006 Courtney case? The Courtney case, I don't know that Courtney really applies to this. I think you wrote that case. Surely you know I remember it well. I hope you do. You're better than I. Because I don't know if I remember it all that well. But as I read Courtney, essentially what the court found was, first of all, he wasn't in . . . I think you found he wasn't in custody. But then you got to the question, and it really turned on a question of the second part of Justice Kennedy's test in Siebert. That is, if there is a deliberate two-step interview process used, there's a presumption against admissibility unless there are cumulative or curative steps that are taken. And those curative steps are a passage of time and a retelling of the rights and what the consequences are, and that some admonition that there's not going to be . . . the first statements probably are not going to be admissible. Given this sequence . . . It doesn't apply here. I don't . . . Well, given this sequence, because I don't remember Courtney, I'm not going to even pretend I do. I've slept since then, for sure, on it, but I take you at what he says. But just help me understand this sequence. This is a relatively short sequence with this guy compared to some other cases. But given his presentation about people chasing him, this all occurs, boom, boom, boom, they're trying to figure it out, but they kind of make the statements. Counsel says, well, I think I'll Mirandize him and then get a confession. Why does that not connote this two-step question first prohibition by Missouri V. Siebert? I mean, we've got this . . . not that it's a subjective test, but I mean, they acknowledge trying to figure out what to charge him. They've asked him some questions. So why doesn't that seem to fit this, not calculated, but an intentional sequencing that the two steps is designed to prohibit? I mean, what sanitizes . . . Well . . . . . . in this and on the video? What sanitizes this? What's your best argument? First, I think that the test goes to, or the issue goes to at the outset, did they undertake at the initiation of talking to him, questioning him, to do this in two steps, so that they deliberately did not give Miranda warnings when they should have given Miranda warnings? And . . . Well, let's just say that they didn't initially. They didn't. Let's just say that they didn't initially. They did not. There's no question. They're just trying to figure it out. But within the scheme at some point, it then does trigger in order to do it, because we've got three different scenarios, right? It does. It does. So let's just say initially they don't. They're just trying to figure out what's going on. Right. So we put that to the board. Right. But within the finding out what's going on, then, you know, the clock starts running or ticking in terms of this calculation, if you will. That's what I'm trying to figure out. As I understand the sequence, you've got the first questions at about 142, and then Caput talks to an officer named Rocha, and somebody says, hey, is there something about being under the influence and having a gun? And so they start ruminating on this, and Caput starts, but he doesn't know what needs to be proved. Meanwhile, Officer Thielen is trying to administer a field sobriety test, and basically Mr. Fernandez never makes up his mind, and Thielen gives up. Before that happens, at 148, Fernandez is handcuffed, and then Thielen puts him into the patrol car. In the meantime, Caput is getting, he's called a detective, I believe, to ask him, hey, what do you have to prove to prove a user in possession? And he eventually later makes a call to the AUSA, but at this time he's trying to figure out, do we have, what do we have to prove for this offense? And at 148, as the handcuffs are, and this is the problem, I think, this is our problem area, is the 148, as he's being placed in handcuffs, that's when Caput, Caput should also go up to him at the same time while this is going, and it takes a bit for him to get the handcuffs on. Then he asks these questions. He asks these questions, are you addicted to cocaine? How long have you used cocaine? How long is a while? And so forth. Those are the questions that the court suppressed. Judge Counts suppressed those, finding that at the time the handcuffs were being put on, when those questions were being asked, that was in custody and Miranda should have been given. There is nothing in the record, I think, that suggests that at that time Caput decided to ask those questions as part of a two-step strategy and to not give him Miranda warnings. Judge Counts found, he called it, I think, innocent neglect. I think they had so much going on, Caput was going to ask at the same time Thielen was doing something else, and they overlapped, and yes, he was entitled to Miranda rights, but I don't think Caput made a conscious decision, oh, I'll ask him these without Miranda so I can go back later on and get a confession. And it was not until 152, when Fernandez was already in Thielen's patrol car, that Caput says, I'll probably Mirandize him and get a confession. That isn't a strategy to me. He's thinking out loud, he's now trying to figure out what the proof elements are. He didn't take it. He never took it. You said somebody was trying to administer a field surprise. Thielen kept asking, would you cooperate with me, cooperate with, and Fernandez kept talking about, I'm being chased, I just came here, I just want to live my life. And finally Thielen gave up and said, okay, well, here, and he just put him in handcuffs. I hate to be back where we were at the beginning, but assuming arguendo that the possession of a firearm while under the influence. Not the time that he says, I'm going to Mirandize him, and this is allegedly the strategy, but way earlier at that 146, is that 142 point? Right at that point that he should have Mirandized him once he's already thought of the plan that I'm going to think we can charge him with that. That he should have been Mirandized then. What happens in this case? Well, he wasn't in custody at that time, and so he didn't have to Mirandize him. Okay. That he thought that he might. That he was in custody even while he's sitting there on the stand because he's surrounded. And we can argue, I'm just trying to figure out what result, if that's whenever, if that's the point at which, when he first articulated that I can charge him with this, that that's when he should have been Mirandized. What would happen in this case? I don't think that ... Would we remand it? What would happen? I don't think that controls the outcome. I think what controls the outcome, whether it was two minutes before the handcuffs were placed on or when the handcuffs were placed on, the statements that were suppressed, the ones that were given without Miranda warnings, where Miranda warnings arguably should have been given, were the statements that were given at 148. Those were given at 148, and those the court suppressed, and we did not contest that he was in custody. Maybe we should have. I don't know, but in light of ... So even if we held ... Holder. ... that it was really earlier than that, a few bits earlier than that, still affirm? I think so, because I think the question before the court is, was Judge Counts wrong in finding that there was not a two-step interrogation strategy that was being used? Well, wouldn't that be a two-step interrogation strategy? If he articulated, I think we can arrest him for this, and we're going to go towards that, and then an intermediate step is I need to get a Mirandize and get him a confession. Why isn't that itself a two-step ... It's not published, but I think Gonzales is on point on that particular matter, because in Gonzales, they went with search warrants. We were planning not to arrest him, and they found out that he had guns, and it was when they found out guns, they changed their minds and decided to arrest him. But that's not this situation, because as you pointed out, they had no doubt there were guns immediately at the beginning of this. Well, but they knew he'd committed ... But this one, they're still trying to figure out, did he commit a crime? Did he commit a federal crime? Because Thielen is arresting him for public intoxication. That's what the arrest was for, and in the time period that we're after the statement at 152 where he says, I'll probably Mirandize and do a confession, it's after that that he finally figures out what all the elements are, and he talks to an assistant U.S. attorney who will authorize the case. And by that point, he's already in custody. And so if there is a decision made, and there is a decision made to interview him again with Miranda, but it wasn't made at the beginning of it as part of a strategy to get incriminating statements without Mirandizing. And that's, I think, what CYBIRD is about. It's about, was there a plan going into it? Well, that's the question I came back and asked you. I mean, why is it that the decision to do that has to occur early on, if I said assume and argue when they didn't calculate early on, when they started? I mean, that's just an innocent trying to figure it out. Why does the CYBIRD require the calculation by the officers has to have occurred at the very top of this sequence here where we've got three parts in this decision to do this two-step beginning this interim time period? Why does that exclude? But for it to be calculated to circumvent Miranda, the decision has to be made not to incriminating statements in order for them to go back and then get a confession, and the record here does not show that that's how this decision was made. Oh, okay. No, and I'll sit down. I'm out of time. Thank you. Do you have a final follow-up, or are you done? I mean, I'll let you finish. I think I've said what I need to say. All right. Thank you. Thank you. All right. Back to you, Mr. Sergi. First of all, Your Honor, just to put things in perspective, my client is currently out on supervised release. As a matter of fact, he had asked for permission to be here. He's obviously not here, so he's still under custody, and there is no mootness argument. All right. Let me ask you this straightforwardly. Give me a declarative statement. What is the holding you're looking for from the panel? I mean, down below the district court, you know, suppress one of the statements. We've got this interim deal. You can walk away out of here. What's the holding you want from this panel? A revand? Back on that first point, or what? Tell me. Say it for me. Reversed and remanded for further consideration of his mental health at that point in time because the record at this point, I think, shows that it is reversible, but I also believe that the court would get a second bite at the apple, so to speak. Okay. So is that the two-step thing? Yes. On the two-step thing. Your Honor, one of the issues that occurred to me, I'm sitting here, is we're hearing about 30 cars going through Midland, allegedly chasing my client. That's kind of this cartel train going after my client. Patently absurd. And that goes into his mental health issues. And the fact is, as Judge Elwood, you already pointed out, the conversation about a federal charge is very early on. And common sense, Your Honor, in looking at 922G, the term user isn't even defined. So I think there's an issue there. We could have perhaps briefed. But I want to go back to Judge Stewart's question. You want reversal. Yes. And tell me what the reason is for the reversal. Because they violated, number one, they violated the two-step process that is required, and number two, he's not capable of affirmatively waiving consent because he has mental health issues perhaps compounded by his alleged drug use. You only need one of those to prevail. Yes. So he wants to say this record isn't sufficient or complete in terms of his competence or not. So that's part of the remand. Yes, Your Honor. For the district court to ascertain that. I mean, was that part of the thrust of your objection below? Your Honor, that was not part of the thrust below in the brief. So why do you get it here? Your Honor, I would like to have it reversed and rendered. I think there are mental health issues that should be addressed. I'll ask you a straightforward question. I wasn't trying to trick you. I said if you can walk out of here with it, tell me what it is. And I gave you the shot. And you're trying to do this a la carte. You know, you want a a la carte here on versus a reverse, you know, in remand. Now you've gone into delusions that somebody needs to ascertain that, which was not raised below at all. The district court made the determination that this two-step process was not valid. So that's in the record. So what's the remand on that? That's up or down? Your Honor, the two-step process is a legal conclusion, Your Honor. I know. The district court said it wasn't. So why do we remand on anything? I'm just unclear what the remand is. I'm happy with a simple reversal. Oh, yeah. It didn't take you long to come up with that one, did it? So should we reverse on the two-step process and say that under the facts, even as found by the district court, that it violated the two-step process rule in our case law? Is that what we should do? Is that the right answer? I believe it is the right answer. We'd be very pleased with that answer. Is it doing something new and unusual in extending a doctrine, or is it right in the wheelhouse of our existing two-step doctrine? I believe this is right in the wheelhouse, Your Honor. The facts here are really in dispute. It's when you look at the breadcrumbs that have been left by Officer Tapas and the other law enforcement in the record, it's pretty clear they decided early on to arrest him. It's pretty clear, Your Honor, common sense dictates that if the charge is user of a drug in possession of a firearm, Congress didn't even define the term user. It was common sense. I think the officer knew very early on when he first mentions the federal offense before he talks to the AUSA. My time is up, Your Honor. All right, Mr. Sergey. I think we have you argued. Thank you and Mr. Durbin. It's a different record. We'll try to figure it out and decide the case. You're one of our CJA panel attorneys, and we want you as a panel to know, and the court as a whole, how much we appreciate the CJA attorneys who take these cases on, not only for briefing, but to come in and help us out here in the court. With that, we thank you. Thank you, Mr. Durbin. We appreciate the case will be submitted. We'll get it decided. Thank you, Your Honor.